UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAQUAN PRITCHETT #967138,

                Petitioner,                            Hon. Robert J. Jonker

v.                                         Case No. 1:18-CV-361

GREGORY SKIPPER,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Pritchett's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Pritchett's petition be denied.

## BACKGROUND

As a result of events which occurred on July 23, 2014, Petitioner was charged with open murder, possession of a firearm during the commission of a felony, and retaliating against a witness.   Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

### Robert Adams

Christopher Adams was Robert Adams' youngest son.  (ECF No. 12-17, Trial Transcript, PageID.2487).  Christopher Adams was killed on July 24, 2014, at the age of 19.  (*Id.*).

### Kristie Hofer

As of July 23, 2014, Hofer was employed as a Public Safety Officer for the Kalamazoo Department of Public Safety.  (ECF No. 12-17, Trial Transcript, PageID.2498-2500).  Sometime that evening, Hofer heard a dispatcher broadcast a report of shots fired at 3201 Mt. Olivet.  (*Id.*, PageID.2500-01).  Hofer proceeded to Borgess Hospital where she observed a van stop in the vicinity of the emergency room.  (*Id.*, PageID.2501).  Three people exited the van and began screaming that their "friend's been shot."  (*Id.*, PageID.2501-02).  Hofer approached the van and determined that the victim was not breathing.  (*Id.*, PageID.2502).  Hofer began performing CPR until medical personnel arrived and transported the victim into the hospital.  (*Id.*).  Hofer later learned that the victim, Christopher Adams, passed away.  (*Id.*, PageID.2502-04).

### Laurel Palk

As of July 23, 2014, Palk was employed as a Public Safety Officer for the Kalamazoo Department of Public Safety.  (ECF No. 12-17, Trial Transcript, PageID.2507).  At approximately 9:30 p.m. that evening, Palk responded to a report

of shots fired and proceeded to Borgess Hospital.  (*Id.*, PageID.2508-09).  Upon arriving at the hospital, Palk "assisted with scene security."  (*Id.*, PageID.2509-11).  As part of this process, Palk learned that the van that transported Christopher Adams to the hospital was driven by Ashley Sootsman.  (*Id.*, PageID.2511).  There were two other passengers in the van, Christian Ruiz and Tyler Bishop.  (*Id.*, PageID.2512).

### Keaton Nielsen

As of July 23, 2014, Nielsen was employed as a Public Safety Officer for the Kalamazoo Department of Public Safety.  (ECF No. 12-17, Trial Transcript, PageID.2517018).  At approximately 9:30 p.m. that evening, Nielsen was dispatched to the 3200 block of Mt. Olivet to investigate a shooting.  (*Id.*, PageID.2519).  As part of her investigation, Nielsen spoke with Emily Noble who provided information about the shooting.  (*Id.*, PageID.2519-23).  Nielsen later searched the area for items such as bullets and shell casings, but did not discover any evidence.  (*Id.*, PageID.2523-28).

### Terry Thomas

As of July 23, 2014, Thomas was employed as a Lab Technician for the Kalamazoo Department of Public Safety.  (ECF No. 12-17, Trial Transcript, PageID.2538-40).  At approximately 11:00 p.m. that evening, Thomas was dispatched to assist the investigation of a shooting that occurred at 3201 Mt. Olivet.  (*Id.*, PageID.2540-44).  As part of his investigation, Thomas searched the area for

"any kind of physical evidence of [a] projectile hitting something or skipping off of something," but did not locate any such evidence.   (*Id.*, PageID.2559-62).

### Dr. Joyce DeJong

DeJong is a forensic pathologist who performed the autopsy on Christopher Adams.   (ECF No. 12-18, Trial Transcript, PageID.2593-2601).   Dr. DeJong observed a gunshot entry wound on the right side of Adams' chest.   (*Id.*, PageID.2602-05).   DeJong observed no indication of the type of residue that would be present if the firearm in question had been fired from close range.   (*Id.*, PageID.2603-04).   Further examination revealed that the bullet severed Adams' aorta and then lodged in his back from where it was recovered.   (*Id.*, PageID.2602-14).   DeJong classified Adams' death as a homicide.   (*Id.*, PageID.2616).

### Tod Neldon

As of July 23, 2014, Neldon was employed as a Lab Technician for the Kalamazoo Department of Public Safety.   (ECF No. 12-18, Trial Transcript, PageID.2626-31).   At approximately 9:40 p.m. that evening, Neldon was dispatched to Borgess Hospital to assist in a homicide investigation.   (*Id.*, PageID.2630-31).   Upon arriving at Borgess, Neldon secured the van that transported Christopher Adams to the hospital.   (*Id.*, PageID.2631-35).   An examination of the van revealed a bullet hole in the right front quarter panel.   (*Id.*, PageID.2645-50).   Neldon also discovered "green plant material" believed to be marijuana in Ashley Sootsman's

purse, as well as a container underneath one of the rear seats.  (*Id.*, PageID.2650-52).

### Gary Latham

As of July 23, 2014, Latham was employed as a Crime Lab Specialist with the Kalamazoo Department of Public Safety.  (ECF No. 12-18, Trial Transcript, PageID.2675-76).  At approximately 10:15 p.m. that evening, Latham was dispatched to 3201 Mt. Olivet to assist with a homicide investigation.  (*Id.*, PageID.2688-89).  Latham helped search the area, but was "unable to locate any evidentiary items."  (*Id.*, PageID.2689-92).

Latham later assisted in the investigation of the van in which Christopher Adams was transported to the hospital.  (*Id.*, PageID.2693-94).  An examination of the van revealed a "gunshot impact site" on the passenger side right front quarter panel.  (*Id.*, PageID.2693-96).  When the bullet in question struck the van, it was traveling on a "slightly downward" trajectory.  (*Id.*, PageID.2697-2700).  The bullet was fired from a position 25-60 feet behind the van and approximately 24 degrees to the right of the van.  (*Id.*, PageID.2706-08).  Subsequent examination of the bullet recovered from Christopher Adams revealed it to be either a .38 or .357 caliber projectile "consistent with a revolver-type bullet."  (*Id.*, PageID.2719-21).

Latham also testified regarding the distinction between a pistol and revolver. Specifically, when a pistol is fired, the shell casing is ejected to make room for the next shell.  (*Id.*, PageID.2679-88).  On the other hand, when a revolver is fired, the

5

shell casing is not ejected, but rather the cylinder in which the shells are located simply rotates, placing the next shell in position to be fired.   (*Id.*).

**Christian Ruiz**

Ruiz, Christopher Adams, Tyler Bishop, and Ashley Sootsman were all friends. (ECF No. 12-18, Trial Transcript, PageID.2735-37).   Ruiz was also "acquaintances" of Petitioner, Charles Wright, and Darrion Pulliam.   (*Id.*, PageID.2738-39).

On July 21, 2014, Ruiz and Adams met with Charles Wright, Darrion Pulliam, and Tony Briones.   (*Id.*, PageID.2740-41).   Ruiz sold the group marijuana, but was paid with a fake one-hundred dollar bill.   (*Id.*, PageID.2740-44).   By the time Ruiz realized what had happened, however, the group had departed.   (*Id.*, PageID.2741-45).   Later that evening, Ruiz, Adams, and several other people drove around the area looking for Wright and his companions.   (*Id.*, PageID.2745-47).   Neither Ruiz, nor any of the people riding with him, were carrying firearms.   (*Id.*, PageID.2747-48).   At some point, Ruiz and his group encountered Petitioner.   (*Id.,* PageID.2748-49).   Petitioner indicated that he did not know anything about the incident between Ruiz and Wright, but would let them know if he learned anything.   (*Id.*, PageID.2749-50).

The following afternoon, Ruiz, Adams, Bishop, and Sootsman departed in Sootsman's van to purchase more marijuana.   (*Id.*, PageID.2751-55).   After purchasing marijuana, Ruiz observed Charles Wright, Tony Briones, Petitioner, and others sitting outside.   (*Id.*, PageID.2755-59).   Sootsman slowly drove her van past

the location where Wright and the others were sitting. (*Id.*, PageID.2755-61). Nobody in Sootsman's van was carrying a firearm. (*Id.*, PageID.2761). As Sootsman drove past this location, Ruiz, Adams, and Bishop began yelling "smack" at Wright and the others. (*Id.*, PageID.2759-61). Wright and his companions, however, did not respond to this provocation and Sootsman simply drove away. (*Id.,* PageID.2761-62).

On the afternoon of July 23, 2014, Ruiz, Adams, Bishop, and Sootsman met to purchase more marijuana. (*Id.*, PageID.2764-74). Bishop was carrying a small handgun, but Ruiz was unable to observe whether it was a revolver or a pistol. (*Id.*, PageID.2767-69). Bishop "wasn't upset" about Ruiz having been fooled with the fake one-hundred dollar bill two days earlier, but nevertheless he wanted to be prepared. (*Id.*, PageID.2770-71). Likewise, Adams "didn't really have a care" about Ruiz being ripped-off. (*Id.*, PageID.2771).

After purchasing marijuana, the group observed Petitioner, Charles Wright, and Darrion Pulliam walking down the street. (*Id.*, PageID.2774-75). Sootsman stopped in front of 3201 Mt. Olivet at which point Ruiz exited the van and began chasing the group. (*Id.*, PageID.2776-80). After taking "a couple steps," however, Ruiz heard Adams yell, "he's got a gun." (*Id.*, PageID.2776-79). Ruiz immediately stopped running, turned around, and observed Petitioner fire a revolver. (*Id.*, PageID.2779). Ruiz immediately ran back to the van. (*Id.*, PageID.2779-84).

Once Ruiz, Adams, and Bishop were back inside the van, Sootsman drove away.  (*Id.*, PageID.2779-85).   As Sootsman drove away, Petitioner continued firing at the van.  (*Id.*, PageID.2790-92, 2814-15).   Ruiz also heard two gunshots that originated from inside the van.  (*Id.*, PageID.2794).   Once Ruiz realized that Adams had been shot, he instructed Sootsman to drive to the hospital.  (*Id.*, PageID.2797-2800).   As the group was driving to the hospital, Ruiz observed Bishop picking up used shell casings from the floor of the van.   (*Id.*, PageID.2800-01, 2811-12).

**Darrion Pulliam**

Pulliam was friends with Charles Wright and Petitioner.  (ECF No. 12-19, Trial Transcript, PageID.2870-71).   On July 21, 2014, Pulliam, Wright, and Petitioner purchased marijuana from Christian Ruiz using a fake one-hundred dollar bill.  (*Id.*, PageID.2873-77).   Later that evening, Pulliam and Petitioner were walking to Charles Wright's residence when a vehicle approached.  (*Id.*, PageID.2877-78).   One of the vehicle's occupants asked, "are you the people who did this to my cousin?"  (*Id.*, PageID.2878).   Pulliam and Petitioner responded, "no," at which point the vehicle "drove off."  (*Id.*).   The occupants of the vehicle were not carrying firearms and made no threats to Pulliam or Petitioner.   (*Id.*, PageID.2877-80).

The following day, Pulliam, Charles Wright, Petitioner, and others were sitting outside a friend's house when a minivan, driven by a woman, passed by.  (*Id.*, PageID.2880-82).   One of the minivan's occupants began yelling for Tony "to come

8

out on the street." (*Id.*, PageID.2882-84).    Nobody exited the minivan, however, and no threats were made.  (*Id.*, PageID.2883-84).  There was likewise no indication that anybody in the minivan was carrying a firearm.  (*Id.*, PageID.2884).  Nobody responded to this provocation, and the minivan simply drove away.  (*Id.*, PageID.2884-85).

On July 23, 2014, Pulliam, Wright, and Petitioner were walking together on Mt. Olivet when a van approached and stopped on the side of the road.  (*Id.*, PageID.2885-93).  When the van stopped, Christopher Adams and Tyler Bishop jumped out.  (*Id.*, PageID.2893-94).  Petitioner immediately "pulled out his gun" and fired two shots, the first into the air and a second "toward" the van.  (*Id.*, PageID.2895-97).  After Petitioner fired this second shot, Tyler Bishop responded by firing a weapon.  (*Id.*, PageID.2900).  Pulliam then fled the scene.  (*Id.*, PageID.2901).

### Ashley Sootsman

Sootsman was friends with Christopher Adams, Tyler Bishop, and Christian Ruiz.  (ECF No. 12-19, Trial Transcript, PageID.2922-24).  On July 22, 2014, the group was riding in Sootsman's minivan.  (*Id.*, PageID.2927-28).  Sootsman was instructed to drive past a particular location where Adams, Bishop, and Ruiz thought "the other three boys" they were looking for might be located.  (*Id.*).  Sootsman drove past the location in question, but there was no indication that the people in question were present, so Sootsman simply drove away.  (*Id.*, PageID.2928-29).

On July 23, 2014, Sootsman drove Adams, Bishop, and Ruiz to purchase marijuana.   (*Id.*, PageID.2930-32).    Shortly thereafter, somebody in the van instructed Sootsman to turn around and stop near three young men who were walking on the sidewalk.   (*Id.*, PageID.2932-34).   After stopping, Adams, Bishop, and Ruiz exited the van.   (*Id.*, PageID.2934-35).   Sootsman then heard three or four gunshots, one of which struck her van, but she could not identify who fired them. (*Id.*, PageID.2935-40, 2946).   Adams, Bishop, and Ruiz then "scramble[ed] back into" the van.   (*Id.*, PageID.2940).   When Sootsman realized that Adams had been shot, she drove to the hospital.   (*Id.*, PageID.2940-52).

### Emily Noble

As of July 23, 2014, Noble resided at 3201 Mt. Olivet.   (ECF No. 12-19, Trial Transcript, PageID.2969-71).   At approximately 9:00 p.m. that evening, Noble looked out her front window because her dog was "freaking out."   (*Id.*, PageID.2971-75).   Noble observed a van that had stopped outside her house.   (*Id.*, PageID.2975-76).   Somebody in the van yelled, "I've got you now, motherfucker," immediately after which gunfire was exchanged between somebody inside the van and another person who was in Noble's yard.   (*Id.*, PageID.2976-80).

10

## Charles Wright[1]

Wright was friends with Petitioner and Darrion Pulliam.  (ECF No. 12-19, Trial Transcript, PageID.3000-02).   On July 22, 2014, Wright, Pulliam, Petitioner, and others were sitting outside when a van approached their location.   (*Id.*, PageID.3004-06).   The van's occupants "confronted" Wright and his companions regarding an "ongoing disagreement" between the two groups following Wright's purchase of marijuana using a fake one-hundred dollar bill.   (*Id.*, PageID.3003-04). But, when Wright and the others walked from the porch to the driveway, the van drove away.   (*Id.*, PageID.3004-07).

On the evening of July 23, 2014, Wright, Pulliam, and Petitioner were walking together when a van approached.   (*Id.*, PageID.3003-12).   The van stopped and the occupants "jumped out."   (*Id.*, PageID.3010-12).   Petitioner fired his weapon at which point Wright began to run away.   (*Id.*, PageID.3013-14).   As he was running away, Wright heard additional gunshots, but could not identify their origin.   (*Id.*, PageID.3013-15).   Specifically, Wright did not observe Petitioner firing his weapon at the van.   (*Id.*, PageID.3021-23).   Wright could not identify the van's occupants, but he knew that the encounter concerned his recent purchase of marijuana using a fake one-hundred dollar bill.   (*Id.*, PageID.3003-04, 3010).   Wright also acknowledged that he had received online threats regarding his purchase of

---

[1] Because Wright was unavailable to testify at Petitioner's trial, the jury was shown a video recording of the testimony Wright provided at Petitioner's preliminary examination.

marijuana with counterfeit money.    (*Id.*, PageID.3018-19).    Wright informed Petitioner of these threats.    (*Id.*, PageID.3019).

### Timothy Taylor

Taylor was friends with Petitioner, Darrion Pulliam, and Charles Wright. (ECF No. 12-20, Trial Transcript, PageID.3052-54).    A "couple weeks" before Christopher Adams was killed, Taylor overheard Petitioner talking to Pulliam about a .357 firearm.    (*Id.*, PageID.3061).

### Nelson Smith

Smith was friends with Petitioner, Darrion Pulliam, and Charles Wright. (ECF No. 12-20, Trial Transcript, PageID.3068-70).    Approximately one month before Christopher Adams was killed, Smith overheard Petitioner "talking about a gun."  (*Id.*, PageID.3077-78).

### Jan Cady

As of July 23, 2014, Cady resided on Mt. Olivet near the location where Christopher Adams was killed.    (ECF No. 12-20, Trial Transcript, PageID.3082-83). Sometime that evening, Cady heard "two or three bangs," which he thought might have been gunfire.    (*Id.*, PageID.3083-84).    When Cady looked out his front door, he saw three young men laughing and running away from the area where Adams was shot and killed.    (*Id.*, PageID.3084-88).

12

## Robin Langdon

As of July 23, 2014, Langdon lived with Jan Cady.  (ECF No. 12-20, Trial Transcript, PageID.3093).   At approximately 9:00 p.m. that evening, Langdon heard what she thought was fireworks.  (*Id.*, PageID.3093-94).   Langdon then looked outside and saw three young men laughing and running away from the area where Christopher Adams was killed.  (*Id.*, PageID.3094-98).

## Stacy Geik

As of July 27, 2014, Geik was employed as a Lieutenant with the Kalamazoo Department of Public Safety (DPS).  (ECF No. 12-20, Trial Transcript, PageID.3102-04).   On this date, by which time a warrant for Petitioner's arrest had been issued, Petitioner arrived at DPS headquarters.  (*Id.*, PageID.3104-07).   While awaiting the arrival of a detective, Geik and Petitioner spoke briefly.  (*Id.*, PageID.3107-09). Petitioner stated that he "wanted to give his side of the story" and "set the record straight" because "he wasn't happy with the media and how they portrayed him." (*Id.*).

Regarding the killing of Christopher Adams, Petitioner stated that "there had been a feud," which originated when Charles Wright paid for marijuana using a fake one-hundred dollar bill.  (*Id.*, PageID.3110).   Petitioner initially stated that he "blacked out" when the shooting of Adams occurred.  (*Id.*, PageID.3111).   Geik responded that Petitioner "shot and killed the man," but conceded that "it could have been in self-defense, it could have been in fear, [or] it could have been an accident."

13

(*Id.*).   Petitioner responded, "that could have happened," but nonetheless "agreed that he shot the weapon."   (*Id.*, PageID.3112).   Petitioner admitted that he was carrying a "small revolver" on the day in question.   (*Id.*).

### Jeffrey Johnson

As of July 27, 2014, Johnson was employed as a Detective with the Kalamazoo Department of Public Safety.   (ECF No. 12-20, Trial Transcript, PageID.3123-26). On this date, Johnson conducted, with the assistance of Detective Sheila Goodell, an interview of Petitioner concerning the killing of Christopher Adams.   (*Id.*, PageID.3126-29).

Petitioner stated that, on July 21, 2014, "there was some type of drug deal" and "there had been some fake money that had been exchanged. . . ."   (*Id.*, PageID.3129). As for the events of July 23, 2014, Petitioner reported that he was walking with Darrion Pulliam and Charles Wright when a van approached.   (*Id.*, PageID.3146-49).   Petitioner indicated that several people exited the van and began chasing them. (*Id.*, PageID.3149-50, 3155-56).   According to Petitioner, Christopher Adams exited the van holding a gun and began chasing Wright.   (*Id.*, PageID.3161-62).

Petitioner reported that he ran away, but then fell down and "blacked out." (*Id.*, PageID.3150).   According to Petitioner, Wright then approached him and urged him to leave because Petitioner "shot at them."   (*Id.*, PageID.3150-51, 3156-57). Petitioner acknowledged that he was carrying a gun that day.   (*Id.*, PageID.3146-47, 3159).   When Johnson told Petitioner that none of the witnesses described seeing

14

him or any member of his group fall down or blackout, Petitioner changed his story, admitting that he "actually shot twice at the people as he was running." (*Id.*, PageID.3182-84).

### Cory Ghiringhelli

As of September 15, 2014, Ghiringhelli was employed as a detective with the Kalamazoo Department of Public Safety. (ECF No. 12-20, Trial Transcript, PageID.3208-11). On this date, Ghiringhelli received a note from Petitioner indicating that Petitioner wanted to speak with a detective "as soon as possible." (*Id.*, PageID.3212-13). Ghiringhelli met with Petitioner later that day. (*Id.*). Petitioner told Ghiringhelli that, while he did, in fact, fire his weapon twice during the incident in question, he fired both shots "into the air." (*Id.*, PageID.3214). Petitioner also stated that Charles Wright had a gun on the day in question and was exchanging gunfire with the people in the van. (*Id.*).

Ghiringhelli also testified about the contents of certain telephone calls between Petitioner and his then-girlfriend, Nuk, which were intercepted by jail officials. (*Id.*, PageID.3215-16). The day after Petitioner's preliminary examination, Petitioner telephoned Nuk to complain about the testimony provided by Darrion Pulliam and Charles Wright. (*Id.*, PageID.3216-17). During this conversation, Petitioner instructed Nuk to speak with "Caleb and Anthony" and tell them to assault Pulliam and Wright. (*Id.*, PageID.3217-23). In a subsequent conversation, Nuk informed Petitioner that "the message had been delivered to" Caleb and Anthony. (*Id.*,

15

PageID.3224-26).   Ghiringhelli later spoke with Caleb who confirmed that he had been instructed to "cause physical harm" to Pulliam and Wright.   (*Id.*, PageID.3228-29).

### Daquan Pritchett

Three trials were conducted in this matter.   The first trial was terminated because a jury could not be selected.   (ECF No. 12-7, Trial Transcript, PageID.746-53).   Following the presentation of evidence in Petitioner's second trial, a mistrial was declared due to juror misconduct.   (ECF No. 12-15, Trial Transcript, PageID.2012-29).   Petitioner testified at this second trial, (ECF No. 12-12, Trial Transcript, PageID.1831-89), and portions of this testimony were presented to the jury in his third trial.   (ECF No. 12-20, Trial Transcript, PageID.3245-50).

Petitioner spoke with his then-girlfriend, Nuk, on August 20, 2014, the day after his preliminary examination.   (*Id.*, PageID.3250-51).   Petitioner was upset during this conversation because Charles Wright and Darrion Pulliam "lied under oath" at his preliminary examination.   (*Id.*, PageID.3251-52).   Petitioner, however, did not make any effort to have anybody communicate with, or threaten, Wright or Pulliam.   (*Id.*).

On July 22, 2014, Petitioner, Wright, and Pulliam were hanging out together at a friend's house when a van drove by.   (*Id.*, PageID.3255-56).   The occupants of the van were "yelling" at Petitioner and the others to "come over here" because "we got something for you . . . ."   (*Id.*, PageID.3255-57).   This was not a "cool and calm"

exchange, but nobody exited the van.    (*Id.*, PageID.3256-57).    None of Petitioner's group responded, however.    (*Id.*).

On the evening of July 23, 2014, Petitioner, Charles Wright, and Darrion Pulliam, were walking together when a van approached.    (*Id.*, PageID.3261-62).    As the van neared Petitioner and his friends, three people jumped out.    (*Id.*, PageID.3261-63).    One of the people that jumped out of the van was carrying a firearm.    (*Id.*, PageID.3263-64).    Petitioner conceded that his previous statements to law enforcement that he "blacked out" during this encounter were untruthful. (*Id.*, PageID.3259-60).    Instead, Petitioner acknowledged that he responded to the situation by initially firing a shot into the air.    (*Id.*, PageID.3262-68).    Petitioner then began running away, but as he was doing so he fired a second shot "in the vicinity of" the van.    (*Id.*).    Petitioner did not shoot at any particular individual, but instead fired his weapon out of fear because "they'd been chasing us around already with guns and all types of stuff."    (*Id.*, PageID.3267).

Following the presentation of evidence, the jury found Petitioner guilty of second-degree murder, possession of a firearm during the commission of a felony, and retaliation against a witness.    (ECF No. 12-22, Trial Transcript, PageID.3448). Petitioner was sentenced to serve twenty to fifty years in prison for the second-degree murder conviction and lesser sentences for the other two convictions.    (ECF No. 12-23, Sentencing Transcript, PageID.3467-68).

Petitioner appealed his convictions in the Michigan Court of Appeals asserting the following claims:

I.    Impermissible expert testimony by a never qualified witness deprived Defendant of his constitutional right to a fair trial; alternatively, trial counsel was ineffective for failing to object.

II.    The prosecutor committed error in his direct examination of the decedent's father, in his direct examination of Mr. Latham, and in closing argument, which violated Defendant's due process rights to a fair trial; alternatively, trial counsel was ineffective for failing to object during closing argument.

III.    The trial court erred in allowing the admission of Charles Wright's preliminary examination testimony under MRE 804(B)(1) and the presentation of his recorded testimony violated Defendant's constitutional right to confrontation; alternatively, trial counsel was ineffective for failing to object.

IV.    Defendant was denied his state and federal due process rights where his conviction for second-degree murder was not supported by evidence sufficient to establish his guilt beyond a reasonable doubt; the prosecutor failed to disprove beyond a reasonable doubt that the killing was justified by self-defense.

V.    Significantly shortened recordings of jail phone calls should not have been admitted pursuant to MRE 106 or MRE 403; alternatively, trial counsel was ineffective for failing to object.

The Michigan Court of Appeals affirmed Petitioner's convictions.   *People v. Pritchett*, 2017 WL 1422830 (Mich. Ct. App., Apr. 20, 2017).   Raising the same issues, Petitioner unsuccessfully moved in the Michigan Supreme Court for leave to appeal. *People v. Pritchett*, 903 N.W.2d 581 (Mich. 2017).   Petitioner subsequently initiated the present action in which he asserts the same claims identified above.

## <u>STANDARD OF REVIEW</u>

Pritchett's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
> >
> > (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."   *Bell v. Cone*, 535 U.S. 685, 693 (2002). As the Supreme Court recently emphasized, this standard is "intentionally difficult to meet."   *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (internal quotation omitted).

Pursuant to Section 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that

are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).   A writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411.   Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.   *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308.   Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Ibid.*

As previously noted, Section 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy either subsection therein.   This requirement, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"   *Harrington v. Richter*, 562 U.S. 86, 100 (2011).

Instead, if a state court rejects a federal claim, a federal habeas court "*must presume that the federal claim was adjudicated on the merits.*"    *Johnson v. Williams*, 568 U.S. 289, 301 (2013).   If this presumption is overcome, however, the Court reviews the matter de novo.   *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

## ANALYSIS

## I.    **Procedural Default**

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address a petitioner's claims because of a failure to satisfy state procedural requirements.    *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).   Where a petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground generally precluding review by a federal court.    *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).   If a claim has been procedurally defaulted, federal habeas review is available only if the petitioner can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice.    *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (citing *Coleman*, 501 U.S. at 750).

Respondent argues that Petitioner has procedurally defaulted several of the claims asserted before this Court.   The Court, however, is not obligated to address Respondent's procedural default arguments and can instead simply decide Pritchett's petition on the merits.   *See, e.g., Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (recognizing that "judicial economy" may justify addressing a habeas petition on the merits rather than addressing complicated procedural default questions).

Rather than attempt to navigate potentially difficult questions of procedural default law, for which there may not be clear answers, and potentially waste scarce judicial resources should the Court's analysis of such later be found in error, the Court opts to simply address Petitioner's claims on the merits.   *See, e.g., McLemore v. Bell*, 503 Fed. Appx. 398, 404 (6th Cir., Oct. 31, 2012) (observing that when facing "the analytical morass in which procedural-default rules ensnare us," "[a]n analysis of the merits of the petitioner's substantive claims presents a more straightforward ground for decision").   The Court finds that Respondent is not prejudiced by such because even addressed on the merits, Petitioner's claims do not entitle him to relief.

## II.    Expert Testimony

During the incident in which Christopher Adams was killed, firearms were fired by two different people: Petitioner and Tyler Bishop.   Accordingly, one of the issues at trial was to determine from whose weapon the bullet that killed Adams was fired.   To assist the jury in making this assessment, the prosecution questioned

Crime Lab Specialist Gary Latham who offered opinion testimony regarding ballistics and firearms analysis.

Petitioner argues that he is entitled to relief because the trial court permitted Latham to provide expert opinion testimony in violation of the Michigan Rules of Evidence. Specifically, Petitioner argues that Latham, regardless of his qualifications, should not have been permitted to offer opinion testimony regarding ballistics and firearms analysis because the basis for such is not scientifically valid. Petitioner also argues that even if ballistics and firearms analysis is scientifically valid, Latham was not sufficiently qualified to opine on such. Petitioner further argues that this error so infected his trial with unfairness that his constitutional right to a fair trial was violated.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather,

Petitioner must establish that his conviction violated the Constitution or laws of the United States.  *Id.*  In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."  *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512.   State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Ibid.* Whether the admission of evidence constitutes a denial of fundamental fairness "turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Ege v. Yukins*, 485 F.3d 364, 375 (6th. Cir. 2007).

To the extent Petitioner argues that admission of the evidence in question violated Michigan law or rules of evidence, such is not a basis for relief in this Court. Moreover, Petitioner cannot establish that admission of this evidence violated his constitutional right to a fair trial.   Ballistics and firearms analysis testimony is widely accepted as a subject on which a properly qualified expert can testify. *See, e.g., Ricks v. Pauch*, 2020 WL 1491750 at *8-13 (E.D. Mich., Mar. 23, 2020) (the subject of ballistics and firearms analysis satisfies the *Daubert* standard and any

24

"weaknesses" in such "can be effectively explored on cross-examination"); *United States v. Ashburn*, 88 F.Supp.3d 239, 242-47 (E.D.N.Y. 2015) (same).

One limitation that courts permitting expert testimony on this topic have often imposed, however, is that the witness refrain from testifying that his or her opinion is based on any degree of certainty and instead limit their conclusions to that which is "consistent with" or "more likely than not."   *See, e.g., Pauch*, 2020 WL 1491750 at *13; *Ashburn*, 88 F.Supp.3d at 248.   Latham's testimony was consistent with this limitation.   Specifically, Latham testified that based upon his examination and expertise, the bullet recovered from Adams' body was "consistent with" having been fired from a revolver.[2]

As for Petitioner's claim that, even if this topic satisfies the *Daubert* standard, Latham was not personally qualified to opine on such is unpersuasive.   The Michigan Court of Appeals reasonably concluded that Latham was, in fact, qualified to opine on ballistics and firearms analysis, observing:

> Specialist Latham testified that he was employed as a "crime lab specialist" with the Kalamazoo Department of Public Safety and had been "since 2006," that he had "been a public safety officer since 1998," and that he was a "crime lab technician [from] 2002 [until being] promoted to crime lab specialist in 2006"; that he has "a Bachelor of Science in Criminal Justice with an emphasis in criminalistics" and had "interned with the Kalamazoo Crime Lab while . . . going through [his]

---

2 This testimony was significant because the evidence, including Petitioner's own statements, revealed that Petitioner was carrying a revolver on the day in question. On the other hand, Latham's testimony regarding the distinction between revolvers and pistols, coupled with Ruiz's testimony that Bishop was collecting shell casings after firing his weapon, supports the conclusion that Bishop was carrying a pistol on the day in question.

college years"; and that he had completed "accident reconstruction training," "over 200 hours in crime scene analysis training, about 360 hours in traffic crash investigation training, over 150 hours in forensic video training, 300 hours training in controlled substance examination . . . and 150 hours of training in firearms and shooting scene construction."   Based on this experience, education, and training, Specialist Latham then provided extensive testimony regarding the differences between various types of firearms.

*Pritchett*, 2017 WL 1422830 at *3-5.

In short, Petitioner's claim that admission of Latham's testimony violated state law is not cognizable.   Furthermore, admission of Latham's testimony did not deprive Petitioner of a fair trial.   Thus, this claim raises no issue on which habeas relief may be granted.

## III.   Prosecutorial Misconduct

Petitioner argues that his right to a fair trial was violated by four instances of prosecutorial misconduct: (1) eliciting irrelevant testimony from Charles Adams regarding Christopher Adams' "personality as a young child and as he grew older"; (2) presenting improper opinion testimony from Crime Lab Specialist Latham; (3) using "very graphic language" in closing argument to describe the blood loss Christopher Adams suffered after being shot; and (4) improperly vouching for the credibility of Christian Ruiz.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."   *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).   The issue is whether the

26

prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also, Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219).   Thus, even if the challenged comments were improper, habeas relief is available only where the comments were "so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two part analysis.   The Court must first determine whether "the prosecutor's conduct and remarks were improper."   *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007).   If such is the case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal."   *Id.* at 759.   When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the comments were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial.   *Id.*

It is not inappropriate for a prosecutor to "highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005).   Likewise, the prosecutor is permitted to "point out the lack of evidence supporting [the defendant's] theories." *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005).   Nevertheless, a prosecutor may not "make unfounded and inflammatory attacks on the opposing advocate," *United States v. Young*, 470 U.S. 1, 9 (1985), or "argue that counsel is attempting to mislead the jury."   *West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008).

A.    Charles Adams

Christopher Adams' father, Charles, testified very briefly at the outset of trial. (ECF No. 12-17, Trial Transcript, PageID.2486-97).   Adams testified about his son in positive terms, asserting that Christopher was "a typical boy" who "loved to ride his bike" and play sports.   (*Id.*, PageID.2490).   Adams conceded that Christopher got involved with drugs in high school, but had recently begun "turning it around." (*Id.*, PageID.2491-92).   Christopher was "still dabbling" with marijuana, but nevertheless worked for his father's business "pretty consistently."   (*Id.*, PageID.2492).   Adams also described his interaction with Christopher on the day he was killed.   (*Id.*, PageID.2492-94).

Petitioner argues that Adams' testimony was "irrelevant to proving the elements of the charged offenses and solely aimed at inflaming the jury."   First, the Michigan Court of Appeals found that Charles Adams' testimony was relevant in that

it "was responsive to [Petitioner's] theory" that Christopher Adams was part of a group that had been stalking and threatening Petitioner and his friends for several days. *Pritchett*, 2017 WL 1422830 at *6. While this rationale is somewhat tenuous, the Court cannot conclude that it was unreasonable. Moreover, even if it is assumed that Adams' testimony was not relevant, it hardly violated Petitioner's right to a fair trial. *See, e.g., Hicks v. Collins*, 384 F.3d 204, 221-22 (6th Cir. 2004) (admission of "victim impact" evidence does not violate a defendant's right to a fair trial unless such evidence is "so pronounced and persistent" that it "permeated the entire atmosphere of the trial"); *Beuke v. Houk*, 537 F.3d 618, 640 (6th Cir. 2008) (same). Accordingly, this claim raises no issue on which habeas relief may be granted.

B.      Expert Opinion Testimony

Petitioner next argues that by introducing the expert opinion testimony by Crime Lab Specialist Gary Latham, the prosecutor engaged in misconduct which deprived him of a fair trial. As discussed above, however, Latham's testimony was properly admitted. On this basis, the Michigan Court of Appeals reasonably rejected this claim. *Pritchett*, 2017 WL 1422830 at *6. Accordingly, this claim raises no issue on which habeas relief may be granted.

C.      Closing Argument

In his closing argument, the prosecutor made the following comments, which Petitioner asserts deprived him of a fair trial:

29

> We know that Christopher Adams was shot.   We know that he was
> killed by a single bullet wound to the chest.   We know that it went
> through both lungs and his aorta.   We know that he bled out over two
> liters.   Just to give you an idea, when Dr. DeJong was testifying to that,
> she said over two liters.   Think of a two liter bottle of pop.   Right?
> Empty that out.   It was more blood than that.   That's how much he
> bled out and that's what was inside his chest cavity.   It doesn't include
> what we saw in the van, the blood he lost at the hospital and at the other
> times in this case.   He bled to death is what she said.

(ECF No. 12-21, Trial Transcript, PageID.3361).

As the Michigan Court of Appeals reasonably concluded, the prosecutor was merely arguing facts in evidence, specifically the testimony provided by forensic pathologist, Dr. Joyce DeJong.   *Pritchett*, 2017 WL 1422830 at *6.   In sum, there was nothing improper about the prosecutor's comments.   Moreover, even if the prosecutor's comments were improper, they were isolated and unlikely to mislead the jury.   Furthermore, the evidence of Petitioner's guilt was substantial.   Accordingly, this claim raises no issue on which habeas relief may be granted.

D.     Improper Vouching

Petitioner argues that his right to a fair trial was violated when the prosecutor, in his closing argument, personally vouched for the credibility of Christian Ruiz.   To provide proper context for the allegedly improper comments, quoted below is a portion of the prosecutor's closing argument with the objectionable statements highlighted:

> Let's start with Christian Ruiz, the next slide.   Now, this is a witness
> who's trying to tell you things in this case that he's been trying to forget
> for a very long time, for the last year.   And he did forget some details
> and he remembered some details.   Remember, I went up to him twice
> at the witness stand with a preliminary examination transcript.   One
> time talking about the shells that he saw Tyler Bishop pick up the shells

30

in the van and then later what happened with them.   And then the second time is that he saw the Defendant shoot his friend Christopher Adams.   And he didn't recall, he read it in the transcript, he recalled what happened.

**And if you think back to that testimony, I suggest to you you could actually see him remembering.   He was like, oh, yeah, now I remember.   And you could see that while he was testifying**.   And he's not unlike many of the professional witnesses that testified in this case.   Sometimes I think – Well, let me back up.

When professional witnesses testify, Dr. DeJong, Lab Tech Neldon, Lab Tech Thomas, Lab Specialist Latham, how many times do you recall hearing them say, can I refer to my report.   I don't remember that specific detail, can I refer to my report?   Right?   Because it happened a year ago and these are professional witnesses.   These are people who are collecting evidence for the purpose of, if necessary, coming to court and testifying.   And what did they ask to do time and time again?   Even Dr. DeJong, very professional witness.   I mean she flies all over the world to handle death scenes and even she referred to her report to make sure she had certain details  right.

**And yet we expect a 19-tear-old kid to come in here and testify cold without being able to refer to anything and he did refer to his report.   And he remembered things.    And like I said, I think you could actually see him.   He even did so for Mr. Turpel**.   Mr. Turpel was talking to him about the first thing when he came to the police that he did initially tell the police about the drug deal and that he gave 'em another story and Mr. Ruiz couldn't remember the other story and Mr. Turpel showed him I believe the police report and he was like, oh, yeah, now I remember, and he told about what was the story he  said.

So it wasn't like he was just remembering the things I asked him to remember.  And the other thing is that he didn't just keep remembering everything.   Cause you'll also remember, there was a time I asked him about if he had knowledge that the Defendant had the gun prior to the 23rd and he said no, I don't remember knowing that.   And I said to him, well, do you remember testifying at a previous hearing, blah, blah, blah, this is what you testified to.   And he looked at me and he said no.   I don't remember testifying to that.

**So it's not as if every time somebody asked him a question and he didn't remember and he read it or was informed of what he**

31

**had testified to previously that he just gave in and said yes.   He was actually trying to remember and when he did, he told you. When it was me asking the questions, he told you.   When it was Mr. Turpel asking the questions, he told you.   And when he didn't remember, he told you.   He was trying to tell you the truth about what he remembered of that day.**

And he even went as far when he was talking about seeing the Defendant shoot his friend.   He said, well, I didn't actually see it.   I saw one person shooting into the van.   I saw that my friend had been shot.   And I put it together, circumstantial evidence, I put it together and that's why I said I saw him shoot my friend.

**So this is a guy who's trying to be honest with you.   He's trying to tell you the truth about what happened that day.**

And so when you're reviewing his testimony, what can you do?   Well, I suggest to you, ladies and gentlemen, that if you look at the testimony of others like we've said, right, how does his statement compare to the other evidence?   Is it corroborated by what other people have said?   Is it corroborated by the physical evidence?

(ECF No. 12-21, Trial Transcript, PageID.3340-42).

Improper vouching occurs "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the government behind that witness."   *Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012).   Improper vouching generally occurs when the prosecutor makes "comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony."   *Id.*   A prosecutor is permitted, however, to "argu[e] reasonable inferences from the evidence."   *Landis v. Galarneau*, 2012 WL 2044406 at *4 (6th Cir., June 7, 2012) (quoting *United States v. Collins*, 78 F.3d 1021, 1039-1040 (6th Cir. 1996)).

The prosecutor is likewise permitted to "argue that the jury should arrive at a particular conclusion based upon the record evidence." *Wogenstahl*, 668 F.3d at 329; *see also*, *United States v. Reliford*, 58 F.3d 247, 250-51 (6th Cir. 1995) (so long as he does not improperly vouch for a witness, it is proper for the prosecutor to review the evidence presented and comment on the strength of the State's case).   Finally, where there is conflicting testimony, "it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying." *Collins*, 78 F.3d at 1039-1040.

The Court discerns nothing improper about the prosecutor's comments.   The prosecutor did not express a personal belief in Ruiz's testimony or suggest that he was aware of facts not presented to the jury.   The prosecutor did not ask the jury to uncritically credit Ruiz's testimony.   Rather, the prosecutor encouraged the jury to evaluate Ruiz's testimony based on its context and circumstances and, moreover, by comparing it to the other evidence they saw and heard.   The Michigan Court of Appeals reasonably rejected this claim noting that the prosecutor merely "argued that Ruiz was a credible witness, not that he had any special knowledge regarding Ruiz's truthfulness." *Pritchett*, 2017 WL 1422830 at *6.   Accordingly, this claim raises no issue on which habeas relief may be granted.

## IV.   Charles Wright's Preliminary Examination Testimony

As noted above, because Charles Wright was unavailable to testify at Petitioner's trial, the jury was shown a video recording of the testimony Wright provided at Petitioner's preliminary examination.   Petitioner argues that permitting

this testimony violated Michigan law as well as his constitutional right to confront the witnesses against him.   To the extent Petitioner argues that admission of this testimony violated state law, such cannot form the basis for relief in this Court.   28 U.S.C. § 2254(a).   Petitioner's Confrontation Clause argument is equally unavailing.

The Confrontation Clause of the Sixth Amendment, applied to the states through the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 403-05 (1965), guarantees to every criminal defendant the right "to be confronted with the witnesses against him." *Cruz v. New York*, 481 U.S. 186, 189 (1987).   This right entitles the accused to see the witnesses against him face-to-face, and to hear their testimony.   *See Dowdell v. United States*, 221 U.S. 325, 329-30 (1911) (adequate confrontation requires that the accused have the opportunity to see the witnesses against him face-to-face at trial).

The Confrontation Clause ensures that each witness "will give his statements under oath – thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury."   *Lee v. Illinois*, 476 U.S. 530, 540 (1986).   The Confrontation Clause also permits the jury to observe the witnesses, enabling them to judge by their demeanor on the stand whether they are worthy of belief.   *See Mattox v. United States*, 156 U.S. 237, 242-43 (1895).

The primary right secured by the Confrontation Clause, however, is the right to cross-examine witnesses.   *See Ohio v. Roberts*, 448 U.S. 56, 63 (1980).   The importance of the right to cross-examine adverse witnesses cannot be overstated.   As

is well recognized, cross-examination is the "greatest legal engine ever invented for the discovery of truth."  *California v. Green*, 399 U.S. 149, 158 (1970).[3]  Accordingly, testimonial statements of a witness who did not appear at trial are admissible only if the witness was unavailable at trial and the defendant "had a prior opportunity for cross-examination."  *Davis v. Washington*, 547 U.S. 813, 821 (2006).

Petitioner concedes that he was afforded the opportunity to cross-examine Wright at his preliminary examination, but nevertheless urges the Court "to recognize a rule that cross-examination conducted at a preliminary examination does not satisfy the Confrontation Clause."  While courts recognize that a defendant may not always want to conduct vigorous cross-examination at a preliminary examination, given its purpose and timing, the Supreme Court has never held that admission at trial of preliminary examination testimony by an unavailable witness who was subject to adequate cross-examination violates the Sixth Amendment.  *See, e.g., Miller v. MacLaren*, 737 Fed. Appx. 269, 273-75 (6th Cir., June 12, 2018); *Al-Timimi v. Jackson*, 379 Fed. Appx. 435, 437-40 (6th Cir., May 28, 2010).  Thus, there is no support for the blanket prohibition Petitioner urges the Court to adopt.  Instead, the question is simply whether Petitioner had an "adequate opportunity" to cross-

---

3 Concern about the right to cross-examine witnesses, however, is not a recent phenomenon.  In 1603, Sir Walter Raleigh was prosecuted for conspiring to engage in treason.  Lord Cobham, his alleged co-conspirator, directly inculpated Raleigh as the leader of the conspiracy, but never testified at Raleigh's trial.  Raleigh denied the charges, demanding that he have the opportunity to confront and question Lord Cobham concerning his alleged statements.  Raleigh's request was denied, and he was convicted of treason – and later beheaded.  *Green*, 399 U.S. at 157 n.10.

examine Wright at the preliminary examination and whether the State made a good-faith effort to secure Wright's attendance at trial.

A.    Adequate Opportunity for Cross Examination

The Michigan Court of Appeals reasonably found that Petitioner did, in fact, have an adequate opportunity to cross-examine Wright at the preliminary examination. *Pritchett*, 2017 WL 1422830 at *8.  On direct examination, Wright testified that on July 22, 2014, he, Petitioner, and Darrion Pulliam had been "confronted" by the occupants of a van regarding an "ongoing disagreement" between the two groups following Wright's purchase of marijuana using a fake one-hundred dollar bill.  (ECF No. 12-19, Trial Transcript, PageID.3000-04).  Wright further testified that when the same van returned the following day, its occupants "jumped out" and a gun fight ensued.  (*Id.*, PageID.3003-15).

On cross-examination, Petitioner was afforded the opportunity to explore and challenge this testimony.  In so doing, Wright acknowledged that he had received online threats regarding his purchase of marijuana with counterfeit money.  (*Id.*, PageID.3018-19).  Wright informed Petitioner of these threats, which supported Petitioner's self-defense theory.  (*Id.*, PageID.3019).  Petitioner also obtained from Wright the concession that he never actually observed Petitioner firing his weapon at the van.  (*Id.*, PageID.3021-23).

36

Petitioner has failed to identify any relevant topic or line of inquiry that he was unable to pursue on cross-examination.   Likewise, Petitioner has not identified any information or evidence, learned or obtained only after the preliminary examination, which, had it been known at the time of the preliminary examination, would have resulted in different or more in-depth cross-examination.   Rather, Petitioner's argument is premised on "the differences in the lengths of the preliminary examination and trial testimony" of the witnesses that testified at both the trial and preliminary examination.   This is unpersuasive and the Court notes that Petitioner has identified no authority suggesting that this is a relevant factor in this analysis.

### B.    Unavailability

For Confrontation Clause purposes, a witness is not "unavailable" unless the State made "a good-faith effort to obtain [the witness'] presence at trial."   *Hardy v. Cross*, 565 U.S. 65, 69 (2011).   In this respect, "the lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness."   *Id.* at 70.

In support of his motion to permit the introduction of Charles Wright's preliminary examination testimony, the prosecutor described the efforts undertaken to locate and secure Wright's appearance at trial.   Specifically, the prosecutor asserted that, prior to Petitioner's first trial, a police officer personally served a subpoena on Wright's mother ordering that Wright, then a minor, appear at trial. (ECF No. 12-19, Trial Transcript, PageID.2959-60).   The prosecutor subsequently

37

"made several phone calls" to Wright's mother to ensure that Wright would appear to testify.  (*Id.*, PageID.2960).   Police officers also "sat outside" Wright's residence for "the better part of a 24-hour period" seeking to locate Wright.  (*Id.*).   Despite these efforts, Wright failed to appear.  (*Id.*, PageID.2960-61).   An arrest warrant for Wright was subsequently issued.  (*Id.*).   Prior to Petitioner's third trial, Wright's mother was again served with a subpoena ordering Wright to appear at Petitioner's trial.  (*Id.*, PageID.2961).   Wright's mother refused to reveal Wright's location and stated that her son would not comply with the subpoena.  (*Id.*).

The trial court found that the prosecution had "demonstrated due diligence" in attempting to secure Wright's attendance at trial and, therefore, deemed Wright "unavailable."  (*Id.*, PageID.2962-65).   The Michigan Court of Appeals likewise found that Wright was properly considered "unavailable" noting that "it is unclear what further steps the prosecution might have taken [to secure Wright's attendance] and defendant does not articulate any either."  *Pritchett*, 2017 WL 1422830 at *7. Petitioner's argument to the contrary consists of citing to state law, which cannot form the basis for relief in this Court, and simply asserting the conclusion that the prosecution's efforts were insufficient.

Petitioner's arguments are unpersuasive and fail to demonstrate that the decision by the Michigan Court of Appeals regarding this claim was: (1) contrary to, or involved an unreasonable application of, clearly established federal law, or (2) was based on an unreasonable determination of the facts in light of the evidence

38

presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.

C.    Harmless Error

Confrontation Clause violations are subject to harmless error analysis.   *See Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir. 2003) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).   Accordingly, even if the Court were to find Petitioner suffered a violation of his Confrontation Clause rights, the decision by the Michigan Court of Appeals that any such violation was harmless is reasonable and consistent with federal law.

To avoid application of the harmless error doctrine, Petitioner must establish that any violation of his Confrontation Clause rights had "a substantial and injurious effect or influence in determining the jury's verdict."   *Hofbauer*, 337 F.3d at 718 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).   When evaluating whether a violation of the Confrontation Clause is harmless, the Court must consider: (1) the importance of the witness' testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, and (4) the overall strength of the prosecution's case.   *Hofbauer*, 337 F.3d at 718 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Reviewing Wright's testimony in light of these factors compels the conclusion that any constitutional error resulting from the admission of Wright's preliminary examination testimony was harmless.   As the Michigan Court of Appeals observed, "Wright's testimony did nothing more than corroborate the testimony of several other witnesses" that Petitioner and Tyler Bishop both possessed and fired weapons. *Pritchett*, 2017 WL 1422830 at *8.   As the court further observed, given Wright's testimony that he did not actually observe Petitioner fire his weapon at the van, it is "difficult to ascertain how prejudicial Wright's testimony truly was."   *Ibid.*   In sum, Wright's testimony was cumulative and no more prejudicial to Petitioner's defense than the testimony of certain other witnesses.   Petitioner has also failed to identify any testimony beneficial to his defense that which Wright would have provided had he testified at trial.   Finally, the prosecution's case, while based in large measure on circumstantial evidence, was quite strong.   Accordingly, this claim raises no issue on which habeas relief may be granted.

## V.    Sufficiency of the Evidence

Under Michigan law, the elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse.   *See People v. Bailey*, 549 N.W.2d 325, 331 (Mich. 1996).   Moreover, because Petitioner asserted the defense of self-defense, the prosecution was obligated to disprove such beyond a reasonable doubt.   *See People v. Roper*, 777 N.W.2d 483, 491 (Mich. Ct. App. 2009).   Petitioner argues that the prosecution presented

constitutionally insufficient evidence to support his conviction for second-degree murder.  Specifically, Petitioner argues that the prosecution: (1) failed to prove that he acted with the requisite malice; and (2) failed to disprove his claim of self-defense.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury.  *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006).  Furthermore, where the record supports conflicting inferences the Court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

A.    Malice

Malice is defined as "the intent to kill, an intent to inflict great bodily harm, or the wanton and willful disregard of the likelihood that the natural tendency of the defendant's behavior is to cause death or great bodily harm."   *People v. Hopson*, 444 N.W.2d 167, 169 (Mich. Ct. App. 1989).   Malice may be inferred "from the facts and circumstances of the killing," *People v. Kemp*, 508 N.W.2d 184, 187 (Mich. Ct. App. 1993), including "evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v. Aaron*, 299 N.W.2d 304, 327 (Mich. 1980).   The prosecution was not required to prove that Defendant "intended to harm or kill," merely that he intentionally performed an act "that is in obvious disregard of life-endangering consequences."   *People v. Werner*, 659 N.W.2d 688, 692   (Mich. Ct. App. 2002).

Christian Ruiz and Darrion Pulliam both testified that they observed Petitioner fire his weapon at the van in which Christopher Adams was riding. Petitioner conceded that he fired his weapon "in the vicinity of" the van.   As discussed above, the evidence supported the conclusion that the bullet that killed Adams was fired from Petitioner's weapon.   Interpreted in a light most favorable to the prosecution this evidence adequately establishes that Petitioner intentionally performed an act in obvious disregard for the lives of others or which was likely to cause death.   Thus, the prosecution established beyond a reasonable doubt that Petitioner acted with malice.

42

B.      Self-Defense

A killing is justifiable self-defense "if, under all the circumstances, [the defendant] honestly and reasonably believes that his life is in imminent danger of death or great bodily harm and that it is necessary for him to exercise deadly force." *People v. Riddle*, 649 N.W.2d 30, 34 (Mich. 2002).   Whether Petitioner properly acted in self-defense was "a question of fact for the jury to determine."   *People v. Lausch*, 2020 WL 448203 at *2 (Mich. Ct. App., Jan. 28, 2020) (quoting *People v. Prather*, 328 N.W.2d 556, 560 (Mich. Ct. App. 1982)).   In this respect, the jury was the sole arbiter of "the weight of the evidence or the credibility of witnesses."   *Lausch*, 2020 WL at *2 (quoting *People v. Eisen*, 820 N.W.2d 229, 233 (Mich. Ct. App. 2012)).

Viewing the evidence in a light most favorable to the prosecution reveals the following.   The marijuana sale that led to the deadly altercation in question occurred on July 21, 2014.   Several witnesses testified that later that same day, and again the following day, Christian Ruiz, Tyler Bishop, Ashley Sootsman, and Christopher Adams sought out and encountered Petitioner, Charles Wright, and Darrion Pulliam regarding the dispute concerning the fake currency.   Ruiz and Pulliam both testified, however, that on these occasions no threats were made by Ruiz's group to any member of Petitioner's group.   Ruiz and Pulliam also both testified that none of the people in Ruiz's group were carrying firearms during these encounters.

43

On July 23, 2014, Ruiz, Bishop, Sootsman, and Adams again encountered Petitioner, Wright, and Pulliam.  When the van stopped near Petitioner and his group, Ruiz, Adams, and Bishop exited the van at which point, according to Pulliam, Petitioner immediately drew his weapon and fired a shot into the air.  Pulliam further testified that Petitioner then fired a second shot at the van only after which did Bishop fire his weapon.  Petitioner acknowledged that he fired his weapon at the van, but also conceded that when he did so he was not shooting at any particular person.  Finally, Jan Cady and Robin Langdon both testified that immediately after hearing gunfire, they looked outside and saw three men laughing and running away from the area where Christopher Adams was killed.

From this evidence, a juror could reasonably conclude the following, which sufficiently supports a rejection of Petitioner's claim of self-defense.  Nothing that occurred between Ruiz's group and Petitioner's group on July 21, 2014, or July 22, 2014, would cause a reasonable person to believe that another such encounter would result in Ruiz or any of his companions initiating an attack or assault, certainly not one which would reasonably justify responding with deadly force.  Thus, Petitioner's act of immediately firing his weapon when Ruiz and his companions exited the van did not represent a reasonable response to an honestly perceived threat of imminent danger or serious bodily harm, but instead was an act of aggression or provocation.  Likewise, Petitioner's act of firing wildly at the van, rather than firing at the individual who he alleged was carrying a weapon, represented an act of aggression or

provocation rather than a reasonable response to an honestly perceived threat.   That Petitioner was laughing as he departed the scene of Christopher Adams' murder further supports that Petitioner did not fire his weapon out of fear for his life or safety, but that he instead acted to initiate a confrontation.

Petitioner's argument in support of his claim of self-defense is premised on the jury believing his testimony concerning the encounter.   The jury, however, was free to discount Petitioner's testimony.   Considering that Petitioner's account was directly contradicted by much of the other evidence, as well as Petitioner's concession that he previously provided false statements to law enforcement regarding his actions, it was not unreasonable for the jury to discount Petitioner's testimony.

The Michigan Court of Appeals rejected this claim, concluding that "[Petitioner's] claim asks this Court to accept [his] theory of this case as fact, and this Court is not permitted to resolve such a credibility dispute anew on appeal." *Pritchett*, 2017 WL 1422830 at *8.   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.

## VI.    Jail Phone Call Recordings

To support the charge of witness retaliation, Detective Ghiringhelli testified about the contents of certain telephone calls between Petitioner and his then-girlfriend, Nuk, which were intercepted by jail officials.   In addition to Ghiringhelli's testimony, the audio recording of excerpts of these intercepted phone conversations were played for the jury.    (ECF No. 12-20, Trial Transcript, PageID.3220-28). Petitioner argues that the decision to play only selected excerpts from the many phone calls he made while in jail violated the Michigan Rules of Evidence and his right to a fair trial.    While Petitioner articulates this claim as a denial of his right to a fair trial, it also implicates his related right to present a defense.    Accordingly, the Court has analyzed this claim under both, albeit related, standards.

As previously noted, alleged errors of the Michigan Rules of Evidence cannot form the basis for relief in this Court.    Regarding Petitioner's claim that he was denied the right to a fair trial, as also noted above, errors by a state court on matters involving the admission or exclusion of evidence cannot generally form the basis for federal habeas relief.    To obtain relief on such a claim, Petitioner must establish that the evidentiary ruling constituted constitutional error which caused him to suffer "actual prejudice."    In sum, Petitioner must demonstrate that the ruling was so egregious that it constituted a denial of "fundamental fairness."

Petitioner asserts that the audio excerpts played for the jury constituted only a six-minute portion of two calls which lasted a total of 36 minutes.   Petitioner also asserts that he made more than 300 calls while incarcerated awaiting trial. Petitioner argues that it was fundamentally unfair for the prosecution to play for the jury only a portion of the two calls in question.   Petitioner further argues that the jury should also have been made to listen to "more of the 300 [other] phone calls he made from the jail."

The United States Constitution guarantees to criminal defendants "a meaningful opportunity to present a complete defense."   *United States v. Geisen*, 612 F.3d 471, 495 (6th Cir. 2010) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). This right is not without limits, however, and may be reasonably restricted "to accommodate other legitimate interests in the criminal trial process."   *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also*, *Taylor v. Illinois*, 484 U.S. 400, 412-13 (1988) ("[t]he Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system"); *Couturier v. Vasbinder*, 385 Fed. Appx. 509, 516 (6th Cir., July 13, 2010) ("the right to present a complete defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions") (citation omitted).   As the Supreme Court has recognized, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."   *Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006); *see also*,

47

*Geisen*, 612 F.3d at 495; *United States v. Armstrong*, 2011 WL 3792363 at \*4 (6th Cir., Aug. 26, 2011).

Accordingly, criminal defendants "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Wynne v. Renico*, 606 F.3d 867, 870 (6th Cir. 2010) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).  The application of such rules does not abridge an accused's right to present a defense so long as they are not "arbitrary or disproportionate to the purposes they are designed to serve." *Renico*, 606 F.3d at 870 (quoting *Scheffer*, 523 U.S. at 308).  As is well recognized, trial judges must make many evidentiary rulings during the course of a trial and "the Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Crane*, 476 U.S. at 689-90.

An evidentiary ruling violates a defendant's right to present a defense only where "the exclusion of evidence seriously undermined fundamental elements of the defendant's defense against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315-17).  Accordingly, whether the exclusion of the evidence in question violated the defendant's right to present a defense "depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that otherwise did not exist." *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006).

48

Other than making vague allusions to "context," Petitioner fails to articulate how the prosecution's decision to present brief excerpts from the two phone calls in question was fundamentally unfair or violated his right to a fair trial.   It must also be noted that the prosecutor did not simply present the jury with the excerpts of the two phone calls, he also questioned Detective Ghiringhelli about the phone calls. Petitioner had an opportunity to cross-examine Ghiringhelli about any other portions of his phone calls so as to correct any perceived errors of omission or context.   Finally, as the Michigan Court of Appeals suggested, had the prosecution played for the jury lengthier excerpts than necessary to support the witness retaliation charge, such may very well have been prejudicial to Petitioner given the language Petitioner used and the topics discussed.

In sum, the decision to play for the jury only selected excerpts from the many phone calls Petitioner made while in jail did not violate his right to present a defense or his right to a fair trial.   The Michigan Court of Appeals rejected this claim. *Pritchett*, 2017 WL 1422830 at *9-10.   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.

## VII.    Ineffective Assistance of Trial Counsel

Finally, Petitioner asserts that he was denied the right to the effective assistance of counsel.    Specifically, Petitioner claims that his trial attorney rendered deficient performance by failing to object to the following evidence: (1) Crime Lab Specialist Latham's testimony regarding ballistics and firearms analysis; (2) the various statements comprising Petitioner's claims of prosecutorial misconduct; (3) the introduction of Charles Wright's preliminary examination testimony; and (4) the presentation of incomplete excerpts of Petitioner's recorded phone calls.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.    *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).    To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."    *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).    A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."    *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.   Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).   The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."   *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).   This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."   *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one."   *Premo*, 562 U.S. at 122.   Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.   *Ibid.* (citations omitted).   As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.   Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The

> question is whether there is any reasonable argument that
> counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

As detailed above, all the evidence which Petitioner argues his trial counsel should have objected to was all properly admissible.    Thus, Petitioner cannot establish that he was prejudiced by his attorney's failure to object thereto.  Accordingly, Petitioner's claims fail.    The Michigan Court of Appeals rejected this claim noting that counsel was not obligated to assert "frivolous or meritless" objections or arguments.    *Pritchett*, 2017 WL 1422830 at 10.    This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.    Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.    Accordingly, this claim presents no basis for habeas relief.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.    Accordingly, the undersigned recommends that Pritchett's petition for writ of habeas corpus be denied.    The undersigned further recommends that a certificate of appealability be denied.    *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice.   28 U.S.C. § 636(b)(1)(C).   Failure to file objections within the specified time waives the right to appeal the District Court's order.   *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: April 15, 2020

/s/ Phillip J. Green
PHILLIP J. GREEN
United States Magistrate Judge